Brady, J.
The plaintiff, developer (Quest) seeks to recover from the Town of Westford (the Town) on the ground that the Town, by the application of its wetlands bylaw to lot 9 of plaintiffs subdivision, accomplished a regulatory taking and thus must compensate plaintiff for the fair market value of the property taken. The Town’s Conservation Commission’s rejection of Quest’s proposal to eliminate wetlands and build a single-family house on lot 9 produced three separate lawsuits described in prior opinions of this court granting summary judgment for the Commission. (See decisions of McHugh, J., dated 15 June 1999, and Burnes, J., dated 25 February 00.) On the sole remaining regulatory taking claim,[1] I heard evidence on 18-22 February 02, and on 11 March 02, and took a view. I now find and rule as follows.
Findings
1. The site in question is Lot 9 of a multilot subdivision in Westford known as Phillips Estates. The subdivision was approved by the Town Planning Board in August 1986.
2. The original developer presumably ran into financial difficulty and did not complete the subdivision. In 1995, at a lender’s auction, Quest purchased Lots 3A, 4, 5, 6, 7 and 9, and two “unbuildable” lots designated A and B. Quest paid $550,000 for the lots.
3. Quest eventually sold vacant lots 4, 5, 6 and 7 for $135,000 apiece. Quest built a house on Lot 3A and sold it for $544,504. Quest’s total receipts for the sales are $1,084,504. Its total expenses associated with the entire property, including land purchased, cost of construction, attorneys fees, costs to obtain permits, broker’s fees, loan carrying costs, real estate taxes and closing costs come to $1,179,929. Thus Quest’s expenses currently exceed its revenues on the project by $95,425.
4. Lots A and B are unbuildable because they are too small. Lot 9 is of sufficient size to build upon under the Town zoning bylaw, containing 49,726 square feet, but the lot includes two wetlands designated “F”— 6,198 square feet, and “Y" — 5,822 square feet.
5. Quest sought from the Town Conservation Commission (1) a determination that the Town’s Non-Zoning Wetlands Bylaw and Regulations (Bylaw) were not applicable to Lot 9, and (2) an Order of Conditions to build a single-family residence on Lot 9. Both applications were denied, and the Conservation . Commission’s decisions were upheld in prior decisions of this court by McHugh, J. and Burnes, J. Both judges concluded that the Commission’s actions were not arbitrary or capricious.
6. The Bylaw contains a 100-foot buffer zone around the wetlands in which a septic system may not be constructed. Quest argues that because the Commission will not permit the construction of a septic system on the lot, the Town has, by the application of the Bylaw, deprived Quest of virtually all economic value of the property. Jonathan Avery, a real estate appraiser, testified that if the owner was able to build a residence on Lot 9, the lot would have a present value of $280,000. Otherwise the value, should the lot be available only for accessory uses, recreation, agriculture, horticulture, or sale to abutters, would be $15,000.[2]
7. The parties agree, through their wetlands experts, that “F” and “Y” are wetlands. The crux of the dispute centers around how significant the wetlands are. Although the areas of the wetlands involved (total of 12,020 square feet) are relatively small, I am persuaded by the testimony of the Town’s expert, Dr. Brian Windmiller, that the Lot 9 wetlands do provide functional wetland values, namely flood control, pollution attenuation, and provision of wildlife habitat. As to flood control, the coarse surface formed by the wetland vegetation detains water flow across Lot 9. As to pollution attenuation, the wetlands growth contains plants which help trap pollutants, particularly heavy metals. This trapping slows down the release of pollutants into the groundwater table. Finally, the wetlands provide wildlife habitat value including food for rabbits, deer, and birds, and nesting places for several species of birds.
8. Quest offered to mitigate the wetlands to be eliminated by building new wetlands consisting of 4,990 square feet on Lot A across the street. The Conservation Commission rejected the replication proposal. The area to be replicated was less than the wetlands removed. The area proposed for replacement already serves a significant function as a wildlife habitat. Furthermore, the construction of the repli *83 cated wetlands on Lot A may alter the already existing wetlands on A, and may allow for the invasion of a low value vegetation such as purple loosestrife and/or glossy buckthorn. Finally, replacement wetlands in general have not fared well over the years. Quest agreed to monitor the reconstructed wetlands for one year only, an insufficient time to determine whether the newly constructed wetlands would work. Thus the Commission felt that the proffered replacement would not give back to the Town what Quest proposed to take away. I concur with the Commission’s determination.

Discussion

The governing principles of regulatory taking law are the following. If the application of a bylaw deprives a party of all economically beneficial use of its property, a per se taking is effected, absent certain exceptions. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1027, 1029 (1992). If the regulation results in less than total loss of the economic value of the property, whether a taking occurs depends upon the evaluation of certain factors, namely, (i) the validity of the by-law as applied to the plaintiffs property; (ii) the plaintiffs reasonable investment-backed expectations; (iii) the economic impact on the plaintiffs property; and (iv) the character of the governmental action. FTC Homes of Blackstone, Inc. v. Conservation Commission of Blackstone, 41 Mass.App.Ct. 681, 688 (1996).
There was no per se taking here. Quest purchased several lots, and sold all but Lot 9 for a total of over $1,000,000. Lot 9 has some value, even if a residence cannot be constructed on it. Regulatory taking jurisprudence requires that the court consider a parcel as a whole rather than one of several lots. Moskow v. Commissioner of Envtl. Mgmt., 384 Mass. 530, 533 (1981).
Evaluation of the evidence in this case in light of the factors deemed relevant by the case law leads to the same conclusion, namely that there has been no regulatory taking. There appears to be little difference between this case and FIC Homes. First, the wetlands bylaw is valid as applied to Quest’s property. Quest has failed to prove that the bylaw as applied does not “substantially advance legitimate State interests.” FIC Homes of Blackstone, Inc. v. Conservation Commission of Blackstone, 41 Mass.App.Ct. 681, 690 (1996). The values promoted by wetlands regulation, including those identified as relevant here, are legitimate state interests. Section 171-1 of the Bylaw states its purpose:
The purpose of this chapter is to protect the wetlands, related water resources and adjoining land areas in Westford by prior review and control of activities deemed by the Conservation Commission likely to have a significant or cumulative effect upon wetlands values, including but not limited to the following: public or private water supply, groundwater protection, flood control, erosion and sedimentation control, storm damage prevention, water pollution prevention, fisheries, shellfish, and wildlife habitat and recreation and aquaculture values (collectively, the “wetland values protected by this chapter”).
(Emphasis added.)
The degree to which any wetland is likely to contribute to the values listed will naturally vary. Quest’s wetlands expert, Mr. Jacobs, and the Town’s expert, Dr. Windmiller, describe the subject wetlands as relatively low value. That does not mean, however, that their contributions are insignificant. The Town was bound to consider the “cumulative effect” which elimination of wetlands of this size would have on the wetlands in the Town as a whole. On a mythical scale of all the wetlands in town, perhaps “Y” and “F” would rank low; but should the same line of reasoning be continuously applied in similar instances of requested development, the overall effect would likely be substantial.
The second consideration is Quest’s reasonable investment-backed expectations. Here Quest invested $550,000 in the original land purchase at an auction in 1995. The Bylaw had been in effect since May 1987 (Exhibit 1). Mr. Jacobs originally flagged wetland “F,” but not “Y.” Dr. Windmiller, in addition, flagged “Y.” Quest does not claim that “Y” is not a wetland within the jurisdiction of the Conservation Commission. The wetlands, although perhaps not identified, were on the site before Quest purchased the property; its investigation was not thorough enough to identify them. A plaintiffs investment-backed expectations must be “reasonable and predicated on existing conditions” before it is entitled to a determination of regulatory taking. FIC Homes of Blackstone, Inc. v. Conservation Commission of Blackstone, 41 Mass.App.Ct. 681, 693 (1996). That is not the case here. The price paid by Quest should have reflected the limitations imposed by the Bylaw.
Regarding the third factor, economic impact, I do not construe it as severe in this case. “A reduction in the number of houses that an owner may build is a diminution in value and not a taking.” Moskow v. Commissioner of Envtl. Mgmt., 384 Mass. 530, 534, n.3 (1981); Leonard v. Bromfield, 423 Mass. 152, 156 (1996). Furthermore, lot 9 still has economic value in that it may be used for recreational and other purposes and may be sold to abutters.
Finally, a taking may be more readily found where the interference involves a physical invasion by the Town. Nothing done by the Town in this case may be characterized as a physical invasion. See FIC Homes of Blackstone, Inc. v. Conservation Commission of Blackstone, 41 Mass.App.Ct. 681, 695 (1996). I do not regard the Town’s decision not to use the original developer’s funds on deposit to fix the deficient drainage flow from Connel Street over lot 9 as a physical invasion of the property.

*84
ORDER

For the reasons stated above, judgment shall enter on Counts II and III of the complaint declaring that the application of the Bylaw to Quest’s property does not constitute a regulatory taking.

Counts II and III of No. 97-06343. Judge McHugh granted summary judgment for the Town on Count I.

Mr. Avery’s testimony was generally credible. However, in a taking case, the value must be measured at the time of the taking, not at the time of trial. Here the taking occurred on 25 September 1997, the date the Conservation Commission denied the Order of Conditions. There was no evidence as to the fair market value of the property on that date.